IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

|  |  |  |
|---|---|---|
| PENNSYLVANIA NATIONAL MUTUAL CASUALTY INSURANCE COMPANY, | ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | CASE NO.: 2:11-cv-215-MEF (WO -- Publish) |
| HOWARD SNIDER, *et al.*, | ) ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

This is a declaratory judgment action arising out of the construction of a new residence. Before the Court are pending cross-motions for summary judgment filed by Plaintiff and Counterclaim Defendant Pennsylvania National Mutual Casualty Insurance Company ("Penn National"), and Defendants and Counterclaim/Crossclaim Plaintiffs Howard and Pam Snider (collectively, the "Sniders"). (Docs. #85, 86.) Having reviewed the submissions of the parties, the applicable case law, and having had the benefit of oral argument, the Court finds that Penn National's motion is due to be GRANTED in PART and DENIED in PART, and the Sniders' motion is due to be DENIED.

**I. JURISDICTION**

The Court has subject matter jurisdiction over the claims in this action under 28 U.S.C. § 1332 (diversity). The parties do not contest personal jurisdiction or venue, and the Court finds adequate allegations in support of both.

## II.  STANDARD OF REVIEW

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine [dispute] as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrates the absence of a genuine issue of material fact." *Id.* at 323.  The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing the non-moving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof.  *Id.* at 322–23.

Once the moving party has met its burden, the non-moving party must "go beyond the pleadings and by . . . affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324.  To avoid summary judgment, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  On the other hand, a district court ruling on a motion for summary judgment must believe the evidence of the non-movant and must draw all justifiable inferences from the evidence in the non-moving party's favor.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  After the non-moving party has responded to the motion for summary judgment, the district court must grant summary judgment if there is no genuine dispute of material fact and the moving party is entitled to a judgment as a matter of law.  *See* Fed. R. Civ. P. 56(a).

### III.  FACTS

The pertinent facts are largely undisputed.  The Court will evaluate each motion on its own merits and, to the extent inferences may be drawn from the undisputed facts, will view all facts and inferences in the light most favorable to the non-moving party on each motion.

**1.      Construction of the Sniders' Residence**

In July 2004, the Sniders entered into an oral contract with Jeff Beale ("Beale") and Jeff Beale Homes (collectively, the "Beale Defendants") for the construction of a new residence.  The Sniders verbally agreed to pay Beale the cost of construction plus a 15% profit.  Beale estimated that construction of the residence would cost approximately $650,000, which Howard Snider ("Mr. Snider") believed included Beale's 15% profit.  Beale told Mr. Snider that construction of the residence would take six to eight months and that he expected the home to be ready in early 2005.

Framing of the house, however, did not begin until April 2005.  Beale was also building and remodeling other homes at the same time he was constructing the Sniders' residence.  By 2005, the Sniders were becoming increasingly displeased with Beale's progress on the construction of their home.  They complained to Beale about the slow

progress, as well as rental equipment that was often left unused for periods of time.

Beale faxed invoices to the Sniders on a monthly basis, and Pam Snider ("Mrs. Snider") would pay the invoices within three days. According to Mr. Snider, by March 24, 2006, construction costs for the Sniders' residence were approaching $800,000, and the home was not completed. Beale was last at the Sniders' residence on April 6, 2006, when he came to inspect a cracked retaining wall. Beale toured the home at that time, and Mrs. Snider gave him a punch list that needed to be done to complete the house. Several days later, on April 11, 2006, Mr. Snider called Beale and demanded that he focus on finishing their home, but Beale never returned to the Sniders' job site after April 6, 2006. The Sniders hired another contractor who completed the construction of their home.

## 2.    Construction Defects

The Sniders moved into their new home in the summer of 2006. The Sniders had no written warranty with Beale. Instead, it was their understanding that if there was a problem with construction, Beale would fix it. Upon moving into the home, the Sniders discovered several construction defects, including a cracked retaining wall and water intrusion in multiple areas of the home. According to Mr. Snider, this water intrusion caused mold to accumulate in multiple areas of the home, the wood floors to buckle, the electrical system to suffer damages, and the house to smell "musty." Mr. Snider also claimed that the entrance floor was unlevel, the home's paint job was unsatisfactory, and the exterior stucco was cracked. The Sniders paid over $150,000 to repair these defects, to complete certain work that Beale had failed to perform, and to remove the mold. Mr. Snider did not expect the

4

moisture, mold, and other problems that later developed when he and his wife contracted with Beale to construct the home.

**3.     Insurance Policy**

Penn National issued a commercial general liability ("CGL") insurance policy to the Beale Defendants during the relevant time period (the "Policy"), which included the following insuring agreement:

> **SECTION I – COVERAGES**
>
> **COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY**
>
> 1.     Insuring Agreement
>
> > a.     We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies.  We will have the right and duty to defend the insured against any "suit" seeking those damages.  However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. . .
> >
> > * * *
> >
> > b.     This insurance applies to "bodily injury" and "property damage" only if:
> >
> > > (1)     The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";
> > >
> > > (2)     The "bodily injury" or "property damage" occurs during the policy period; . . .

(Doc. #87-1.)

5

The Policy also contained the following definitions:

**SECTION V – DEFINITIONS**

3.      "Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.[1]

\* \* \*

13.     "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

\* \* \*

16.     "Products-completed operations hazard":

a.      Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except: . . .

(2)     Work that has not yet been completed or abandoned. However, "your work" will be deemed completed at the earliest of the following times:

(a)     When all of the work called for in your contract has been completed.

(b)     When all of the work to be done at the job site has been completed if your contract calls for work on more than one job site.

---

[1]   Through an endorsement, the definition of "bodily injury" in DEFINITIONS (Section V) was replaced by the following:

"Bodily injury" means bodily injury, sickness or disease sustained by a person including mental anguish or death resulting from any of these.

(Doc. #87-2.)

6

      (c)     When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

              Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

* * *

17.    "Property damage" means:

      a.     Physical injury to tangible property, including all resulting loss of use of that property.  All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

      b.     Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

(Doc. #87-1.)

## 4.    The Underlying Litigation

On April 30, 2007, the Sniders sued the Beale Defendants in the Circuit Court of Montgomery County, Alabama,[2] asserting claims for breach of contract and warranty only. Beale provided notice of the lawsuit to Penn National.  Penn National reviewed the claim and, in June 2007, denied coverage on the basis that the Policy did not provide coverage to the Beale Defendants for damages arising from a breach of contract or warranty.

In April 2010, the Sniders provided discovery responses in the underlying litigation

---

    [2] The case is styled *Pam and Howard Snider v. Jeff Beale Homes, et al.*, Civil Action No. CV-2007-900281 (Circuit Court of Montgomery County, Alabama), and will be referred to herein as the underlying litigation or the Snider litigation.

that could have resulted in them asserting negligence claims based on alleged defects in the construction of the Sniders' home.  As a result, the Beale Defendants resubmitted the claim to Penn National for reconsideration, and Penn National subsequently agreed to defend the Beale Defendants under a reservation of rights.

The Sniders, however, never amended the complaint in the underlying litigation to include negligence claims and never submitted any such claims to the jury.  Instead, the Sniders submitted to the jury claims for breach of contract and warranty only.  On October 2, 2012, the jury returned a verdict in favor of the Sniders for $700,000 in compensatory damages.[3]  The verdict form indicates that the jury awarded this amount as damages for claims of breach of contract, implied warranty, emotional distress, and mental anguish.  However, the verdict form did not specify what amount, if any, of the total damages were awarded for breach of contract, implied warranty, or emotional distress/mental anguish.[4]

---

[3] In the underlying litigation, the Beale Defendants also asserted third-party claims against numerous subcontractors who worked on the Sniders' home, including Performance Sealants and Waterproofing, who handled the "waterproofing" of the home.  The Beale Defendants alleged that if they were liable to the Sniders for the waterproofing issues, then Performance Sealants was liable to them.  The jury, however, disagreed and returned a verdict in favor of Performance Sealants on the Beale Defendants' third-party claim.

[4] More specifically, the jury verdict form in the underlying litigation reads as follows:

_____  We the jury find in favor of the plaintiffs, Pam and Howard Snider, against defendant Jeff Beale and Jeff Beale Homes, on the following claims:

_____  Breach of Contract

_____  Implied Warranty

_____  Emotional Distress

## IV.  PROCEDURAL HISTORY

The underlying lawsuit was filed in April 2007.  On March 25, 2011, Penn National filed its complaint for declaratory judgment against the Beale Defendants and the Sniders seeking a declaration that it (Penn National) owed no duty to defend or to indemnify Beale or Jeff Beale Homes for the claims the Sniders made against them in the underlying litigation.  (Doc. #1.)  On April 5, 2011, the Beale Defendants filed an answer to the complaint and asserted counterclaims against Penn National for breach of contract and quantum meruit, which stem from Penn National's initial refusal to provide the Beale Defendants with a defense in the underlying litigation.  (Doc. #9.)  On April 25, 2011, Penn National filed an answer to the Beale Defendants' counterclaims and denied that it was responsible for providing a defense to the Beale Defendants prior to the time that Penn National agreed to provide such a defense under a reservation of rights.  (Doc. #16.)

On February 27, 2012, the Court dismissed, without prejudice, Penn National's duty

_____

_____  Mental Anguish

and assess _____ as Compensatory Damages.


_____  We the jury find in favor of the defendant, Jeff Beale and Jeff Beale Homes against Pam and Howard Snider.

According to the verdict form, the jury in the underlying litigation checked the first blank on the verdict form, indicating that they found in favor of the Sniders and against the Beale Defendants, and also checked the lines by each "claim" (breach of contract, implied warranty, emotional distress, and mental anguish).  The jury then wrote $700,000 in the blank for the amount of compensatory damages they were assessing against the Beale Defendants, but did not specify what amount, if any, was awarded for emotional distress and mental anguish.  (Doc. #56-2.)  The verdict form was signed and dated by the forewoman.

9

to indemnify claim as premature because a judgment had not yet been reached in the underlying litigation. (Doc. #24.) The Court allowed Penn National to proceed with its duty to defend claim.

On August 30, 2012, Penn National filed a summary judgment motion, its first of many, as to its duty to defend. (Doc. #27.) However, on October 2, 2012, before either the Sniders or the Beale Defendants responded to Penn National's motion, a jury verdict in the amount of $700,000 was entered in favor of the Sniders in the underlying state court litigation. As a result, Penn National moved to amend its complaint to remove its duty to defend claim, as it was moot, and to reassert its duty to indemnify claim. (Doc. #32.) Penn National also withdrew its pending summary judgment motion on its duty to defend. (Docs. #33, 41.)

On November 9, 2012, Penn National filed its amended complaint against the Beale Defendants and the Sniders, this time seeking a declaration that it (Penn National) was not liable for any portion of the $700,000 judgment awarded to the Sniders in the underlying litigation. (Doc. #45.) A few weeks later, on November 26, 2012, Beale filed a notice of bankruptcy with the Court. (Doc. #48.) As a result, this matter was stayed for a period of time until the bankruptcy court lifted the automatic stay for the Sniders and Penn National, which occurred in early 2013. With leave of Court, the Sniders then filed a late answer to Penn National's amended complaint and, under Ala. Code § 27-32-2, asserted a "direct action" counterclaim and crossclaim against Penn National and the Beale Defendants, respectively, for recovery of the $700,000 judgment they received in the underlying

10

litigation.  (Doc. #79.)  The Beale Defendants never responded to Penn National's amended complaint.  Penn National answered the Sniders' counterclaim on September 30, 2013.  (Doc. #81.)

Now before the Court are cross-motions for summary judgment filed by the Sniders and Penn National.[5]  (Docs. #85, 86.)  Penn National's motion for summary judgment[6] is twofold.   First, Penn National seeks summary judgment on the Beale Defendants' counterclaims against it for breach of contract and quantum meruit based on the duty to defend.  (Docs. #55, 56, 85.)  Second, Penn National seeks summary judgment on the Sniders' direct action claim against it for indemnification of the $700,000 judgment they obtained against the Beale Defendants in the underlying state court litigation.  (Docs. #55, 56, 85.)  The Sniders likewise seek summary judgment on the direct action indemnification counterclaim they have asserted against Penn National.[7]  (Docs. #86, 87.)  The Court will

---

[5]  The Beale Defendants have not moved for summary judgment as to the indemnification issue in this matter.

[6]  Penn National has filed a number of motions for summary judgment in this action, which have been denied with leave to refile for various reasons.  For clarity's sake, the Court notes that Penn National's pending motion for summary judgment (Doc. #85) is its third renewed motion for summary judgment, and this motion simply renews Penn National's renewed motion for summary judgment (Doc. #55), its brief in support thereof (Doc. #56), and its supplemental statement of facts and submission of evidence included in its second renewed motion for summary judgment (Doc. #67).  The Court will consider all of these filings when resolving the motions for summary judgment currently pending before it.

[7]  Again, for clarity's sake, the Court notes that although the Sniders have moved for summary judgment on their direct action counterclaim against Penn National, they also have an identical direct action crossclaim pending against the Beale Defendants, as they are indispensable parties.  (Doc. #79); Ala. Code § 27-23-2; *Chicago Title Ins. Co. v. Am. Guarantee and Liab. Ins. Co.*, 892 So. 2d 369, 371 (Ala. 2004).  Thus, while the Sniders have not specifically sought summary judgment on their crossclaim against the Beale Defendants, the Court's resolution of their motion

discuss the parties' arguments below.

## IV. DISCUSSION[8]

In a declaratory judgment action, Alabama law[9] places on the insured the burden of establishing that a claim falls within the coverage of the policy, while the insurer bears the burden to prove that any policy exclusion applies. *Owners Ins. Co. v. Shep Jones Const., Inc.*, 2012 WL 1642169, at *3 (N.D. Ala. May 3, 2012) (citing *Chandler v. Ala. Mut. Ins. Co.*, 585 So. 2d 1365, 1367 (Ala. 1991)). The burden is also on the party seeking coverage to prove that coverage existed within the terms of the policy. *Id.* (quoting *Ala. Hosp. Ass'n Trust v. MASA*, 538 So. 2d 1209, 1216 (Ala. 1989)). Thus, in this case, the Sniders must show that the judgment they obtained against the Beale Defendants in the underlying litigation falls within the coverage provided under the Policy, such that Penn National must

---

for summary judgment as to Penn National will necessarily resolve this claim without any separate analysis.

[8] Penn National has moved for summary judgment on both the Sniders' direct action indemnification claim and the Beale Defendants' duty to defend counterclaims. As previously noted, the Beale Defendants asserted counterclaims for breach of contract and quantum meruit arising from Penn National's duty to defend in their answer to Penn National's original complaint. Since then, however, Penn National filed an amended complaint, and the Beale Defendants never answered or otherwise responded. Because the Beale Defendants failed to answer Penn National's amended complaint, and therefore, never reasserted their counterclaims, the Court finds that the Beale Defendants' duty to defend counterclaims were abandoned. *See Settlement Capital Corp., Inc. v. Pagan*, 649 F. Supp. 2d 545, 562 (N.D. Tex. 2009) (finding that counterclaims not reasserted in an amended answer were abandoned). This conclusion is further supported by the Beale Defendants' failure to respond in any manner to Penn National's motion for summary judgment on their counterclaims. Thus, based on the foregoing, Penn National's motion for summary judgment as to the Beale Defendants' counterclaims is DENIED as MOOT.

[9] The parties and the Court agree that this coverage dispute is governed by Alabama law.

indemnify the Beale Defendants for some, if not all, of the $700,000 judgment.

At the trial in the underlying litigation, the Sniders submitted, and the jury was instructed, on two causes of action based on the faulty construction of their home by the Beale Defendants—breach of contract and breach of the implied warranty of habitability. The Sniders sought as damages for these claims (1) the damages they incurred to complete the work the Beale Defendants failed to perform, (2) overcharges they paid to the Beale Defendants for their work, (3) the damages they incurred to correct the Beale Defendants' faulty work, and (4) mental anguish and emotional distress resulting from the Beale Defendants' breaches. The jury was further instructed that the Sniders had the burden to prove their claims for breach of contract and implied warranty, as well as the damages they sought for those claims, including mental anguish and emotional distress. (Doc. #67-1.) At the conclusion of the trial, the jury returned a verdict in favor of the Sniders for breach of contract, breach of implied warranty, mental anguish, and emotional distress and awarded them $700,000 in damages. The jury, however, did not itemize or otherwise apportion the total award among the four "claims."[10]

Based on this, Penn National now argues that it is not obligated to pay any of the $700,000 judgment to the Sniders on the Beale Defendants' behalf because there was no

_____

[10] The Court places the word claims in quotations above because the verdict form executed by the jury in the underlying litigation found in favor of the Sniders on their "claims" of breach of contract, breach of implied warranty, mental anguish, and emotional distress; however, the parties note, and this Court agrees, that mental anguish and emotional distress are not independent claims or causes of action but are a type of compensatory damages the Sniders sought for their claims in the underlying litigation.

"occurrence" to trigger coverage under the Policy because breach of contract and implied warranty are not "occurrences" under Alabama law.  Penn National's argument finds its genesis in the Policy's insuring agreement, which states that Penn National must pay the sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" caused by an "occurrence."[11]  (Doc. #57.)  Thus, the threshold issue for this Court to resolve is whether there was an "occurrence" sufficient to trigger coverage under the Policy.  Only if there was such an "occurrence" would the Court then consider whether any "property damage" or "bodily injury" resulted from that occurrence and, if so, whether any exclusions apply that would except those damages from coverage. *See Town & Country Prop., L.L.C. v. Amerisure Ins. Co.*, 111 So. 3d 699, 705 (Ala. 2011) (noting that, in a CGL policy similar to the one here, exclusions and exceptions under Coverage A are implicated "only if there is first determined to be an 'occurrence'").

The policy defines "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." (Doc. #57-1.) The Alabama Supreme Court has further defined "accident" in the context of an "occurrence" in a CGL policy, like the one at issue here, as "an unintended and unforseen injurious occurrence; something that does not occur in the usual course of events or that could be reasonably

---

[11]  The insuring agreement in the Policy also requires that the "occurrence" take place in the "coverage territory" during the policy period.  In this case, there is no dispute that if there was an "occurrence," it would have taken place in the "coverage territory" during the policy period.

anticipated" or "something unforseen, unexpected or unusual." *Shep Jones*, 2012 WL 1642169 at *3 (citing *Hartford Cas. Ins. Co. v. Merchs. & Farmers Bank*, 928 So. 2d 1006, 1011 (Ala. 2005)); *see also U.S. Liab. Ins. Co. v. Sternenberg Const.*, 2011 WL 3585261, at *4 (M.D. Ala. Aug. 16, 2011). Indeed, "'[a] result, though unexpected, is not an accident; the means or cause must be accidental.'" *Emp'rs Mut. Cas. Co. v. Smith Const. & Dev., LLC*, 2013 WL 26356749, at *9 (N.D. Ala. June 12, 2013) (quoting *Am. Safety Indem. Co. v. T.H. Taylor, Inc.*, 2011 WL 1188433, at *4 (M.D. Ala. Mar. 29, 2011)) (applying Alabama law). The Court will first address indemnification with respect to the Sniders' breach of contract claim. In Alabama, there is no bright-line rule governing whether a contract dispute falls within the standard definition of an "occurrence" in a CGL policy. *See Auto-Owners Inc. Co. v. Toole*, 947 F. Supp. 1557, 1563–64 (M.D. Ala. 1996) (discussing and applying Alabama law). Rather, "in determining whether there is coverage, the court should look to the specific 'kind of . . . claim' being asserted" and "the purpose of the general liability policy from which coverage is sought." *Id.* (quoting *City of Burlington v. Nat'l Union Fire Ins. Co.*, 655 A.2d 719, 722 (Vt. 1994)); *Smith Const.*, 2013 WL 2635649 at *11. Having considered the undisputed facts in this case, the Court agrees with Penn National that there is no coverage under the Policy for the Sniders' breach of contract claim because it does not qualify as an "occurrence" within the meaning of the Policy.

The Court looks to two particular cases in reaching this decision. The first case is *Owners Insurance Company v. Shep Jones Construction*, 2012 WL 1642169, at *1 (N.D. Ala. May 3, 2012), wherein a district court in the Northern District of Alabama considered

facts and issues markedly similar to the ones here.  *Shep Jones* involved a dispute over the insurer's duty to indemnify a general contractor from a judgment entered against it and in favor of the homeowners following a jury trial in state court.   The only claim the homeowners submitted to the jury was breach of contract based on a failed renovation of their home.   The homeowners sought both property damages and mental anguish damages from the contractor.   At the conclusion of the trial, the jury returned a general verdict in the homeowners' favor; however, the verdict form awarded general damages only and did not specify whether the jury was awarding damages for property damage, mental anguish, or both.  *Id.* at *1–3.

In the related declaratory judgment action, both the insurer and the homeowners moved for summary judgment on the issue of indemnification under a CGL policy that the insurer issued to the contractor during the relevant time period, a policy which is nearly identical to the Policy here.[12]  The insurer's primary argument on summary judgment was that it had no duty to indemnify the contractor from the state court judgment because there was no "occurrence" to trigger coverage, as breach of contract is not an "occurrence" under a CGL policy under Alabama law.   Judge Acker, in a thorough and well-reasoned opinion, agreed with the insurer and found that the insurer was not obligated to indemnify the contractor under the policy because the homeowners' breach of contract claim was not an "occurrence" under the policy.   Relying on the Alabama Supreme Court case of *Reliance*

---

[12] This assessment is based on the policy language quoted within the *Shep Jones* opinion and the excerpts of the Policy provided to the Court on summary judgment.

*Insurance Company v. Gary C. Wyatt, Inc.*, 540 So. 2d 688 (Ala. 1988), which held that a breach of contract claim was not an "occurrence" under a CGL policy similar to the one at issue in *Shep Jones* as well as in this case, the *Shep Jones* Court found that a faulty home renovation did not equate to an "accident" sufficient to qualify as an "occurrence" because:

> The purpose of Owners's commercial general liability policy is to protect Shep Jones Construction from liability for essentially accidental injury to person or property, not to be a guarantee or a warranty that Owners stands behind the timeliness and quality of work Shep Jones Construction contracted to perform. To hold otherwise would improperly expand the scope of Owners's liability to Shep Jones Construction at great risk to Owners.

*Shep Jones*, 2012 WL 1642169 at *5.  In other words, a CGL policy protects contractors from true unintended accidents, not poor or substandard workmanship, which, although unexpected and certainly unwanted, is not unforeseeable.

The second case that persuaded the Court in reaching its decision that the Sniders' breach of contract claim is not an "occurrence" under the Policy is *Employers Mutual Casualty Company v. Smith Construction & Development, LLC*, 2013 WL 2635649, at *1 (N.D. Ala. June 12, 2013).  *Smith Construction* involved a declaratory judgment action brought by an insurer to determine whether it had a duty to defend and indemnify a general contractor under a CGL policy it issued to the contractor in an underlying state court action brought against the contractor by homeowners after the contractor abandoned the construction of their new home.  The insurer moved for summary judgment and argued that it had no duty to defend or to indemnify the contractor on the homeowners' breach of contract claim because that claim did not qualify as an "occurrence" under Alabama law.

Like in *Shep Jones*, the district court agreed with the insurer and for similar reasons.  *Id.* at *12.

Specifically, the district court in *Smith Construction* found that the homeowners' breach of contract claim, which was based on the contractor's failure to complete construction of their new home in a good and workmanlike manner, was not a "particularly unusual claim" or one "that could not have been reasonably anticipated when the parties formed the contract."  *Id.* at *12.  Thus, it could not be considered an "accident" under Alabama law, and, therefore, it could not qualify as an "occurrence" under the policy.  Relying on *Shep Jones*, the district court in *Smith Construction* concluded that "[t]he purpose of EMC's Policy was to protect the Smith Defendants from 'liability for essentially accidental injury to person or property.'  It was not meant to be a 'guarantee or a warranty' that EMC certified the 'timeliness and quality' of the Smith Defendants' work.  Treating a standard contract breach as an 'accident' triggering CGL policy coverage would radically alter such insurance agreements."  *Id.* (quoting *Shep Jones*, 2012 WL 1642169 at *5).

Although the district court in *Smith Construction* analyzed whether a breach of contract constitutes an "occurrence" in the duty to defend context, this does not make the reasoning of *Smith Construction* any less applicable in the duty to indemnify context.  Indeed, the same considerations and reasoning in *Shep Jones* and *Smith Construction* are persuasive here.  The Sniders sought, and were awarded damages by a jury, for the Beale Defendants' breach of their construction contract to build the Sniders' residence in a good and workmanlike manner in accordance with the specifications given.  The fact that the Beale

Defendants did not live up to their end of the bargain, although unexpected and certainly unwanted by the Sniders, was not an unforeseeable or unusual result. "Some of the most foreseeable incidents in the performance of a residential construction contract are that the builders will have cost overruns, use inadequate materials, fail to meet deadlines, or otherwise execute the project improperly." *Smith Constr.*, 2013 WL 2635649 at *12. In short, although the Court recognizes the unfortunate predicament the Sniders' have faced in connection with the construction of their home, the Beale Defendants' breach of the construction contract they had with the Sniders "is simply the opposite of an 'accident' under Alabama law" and, therefore, cannot qualify as an "occurrence" under the Policy. *Id.* Accordingly, Penn National is entitled to a summary judgment and a declaration that it owes no indemnity to the Beale Defendants with respect to the judgment entered in favor of the Sniders on their breach of contract claim.

The same conclusion is warranted with respect to the Sniders' breach of implied warranty claim. The trial court instructed the jury in the underlying litigation that the Sniders' breach of warranty claim was based on the implied warranty of habitability. This is a concept in the law that "implies that the builder warrants that the [newly built] house would be of sound workmanship and proper construction." (Doc. #67-1) (alteration to original). In other words, a claim for breach of the implied warranty of habitability is simply a claim of faulty workmanship.

While the law in Alabama is not always clear as to whether a breach of contract qualifies as an "occurrence" under a CGL policy, it is with respect to claims for faulty

workmanship.  The Alabama Supreme Court has repeatedly held that faulty workmanship itself is not an occurrence for purposes of a CGL policy.  *See U.S. Fid. & Guar. Co. v. Warwick*, 446 So. 2d 1021 (Ala. 1984); *Town & Country*, 111 So. 3d at 707.  However, as the Sniders discuss in great detail, Alabama law has qualified this general rule.  In *Moss v. Champion Insurance Company*, 442 So. 2d 26 (Ala. 1983), the Alabama Supreme Court found that there had been an "occurrence" for CGL policy purposes when the contractor's faulty workmanship resulted in not only a poorly constructed roof—the only job the contractor had been hired to perform—but damage to other parts of the plaintiff's home.  *Id.* at 29.  Given the seemingly conflicting decisions in *Warwick* and *Moss*, the Alabama Supreme Court went on to clarify in *Town & Country*, holding:

> We may conclude that faulty workmanship itself is not an occurrence but that faulty workmanship may lead to an occurrence if it subjects personal property or other parts of the structure to 'continuous or repeated exposure' to some other 'general harmful condition' (e.g., the rain in *Moss*) and, as a result of that exposure, personal property or other parts of the structure are damaged.

*Town & Country*, 111 So. 3d at 707.

The Sniders rely significantly on *Town & Country* to support their argument that the underlying state court judgment is covered under the Policy.  According to the Sniders, because the Beale Defendants' faulty workmanship caused damage to something other than the Beale Defendants' work—in this case, the mental anguish suffered by the Sniders— *Town & Country* dictates the conclusion that the Beale Defendants' faulty workmanship qualifies as an "occurrence" under the Policy.  The Court understands the connection the Sniders are attempting to make between other damage in *Town & Country* (to personal

20

property or other parts of the structure which were not part of the contractor's work) and other damage here (bodily injury suffered by the Sniders that was not part of the Beale Defendants' work). However, the cases that rely on *Moss* and *Town & Country* to find that faulty workmanship may be an "occurrence" are when that faulty workmanship subjects *personal property* or other parts of the *actual physical structure* to damage, such as floors or an attic or interior furnishings. *See Moss*, 442 So. 2d at 29; *U.S. Fid. & Guar. Co. v. Bonitz Insulation Co. of Ala.*, 424 So. 2d 569, 573 (Ala. 1982). The Sniders have not cited, nor has the Court found, a case that extends *Town & Country* to find an "occurrence" when faulty workmanship causes damages to something other than tangible property outside the scope of the contractor's work (such as bodily injury claims).

Moreover, the Alabama Supreme Court recently cautioned against "latch[ing] onto the statement in . . . *Town & Country* indicating that 'faulty workmanship may lead to an occurrence if it subjects personal property or other parts of the structure to continuous or repeated exposure to some other 'general harmful condition[.]'" *Owners Ins. Co. v. Jim Carr Homebuilders, LLC*, 2013 WL 5298575, at *5 (Ala. Sept. 20, 2013) (quoting *Town & Country*, 111 So. 3d at 706) (internal quotations omitted). Instead, this "isolated statement . . . must be considered in the context in which it was made—a discussion of *Moss* . . . and *Warwick* . . . ."

> That discussion makes it clear that faulty workmanship performed as part of a construction or repair project may lead to an occurrence if that faulty workmanship subjects personal property or other parts of the structure *outside the scope of that construction or repair project* "to 'continuous or repeated exposure' to some other 'general harmful condition'" and if, as a result of that

> exposure, that personal property or other *unrelated* parts of the structure are damaged. Hence, there was no occurrence in *Warwick*, where the builder's poor workmanship resulted in just a poor final product (the house itself), but there was an occurrence in *Moss* because the contractor's poor work performance resulted not just in a poor final product (the new roof), but also in damage to the homeowner's personal property and other parts of the house outside the scope of the contractor's project—the attic and interior ceilings.

*Id.* In this case, there is no "occurrence" because the Beale Defendants' poor workmanship resulted in just a poor final product (the Sniders' residence itself) and not in damage to other *unrelated* parts of the Sniders' home or their personal property. Because there was no "occurrence" in this case to trigger coverage under the Policy, Penn National is entitled to a summary judgment and a declaration that it owes no indemnity to the Beale Defendants with respect to the judgment entered in favor of the Sniders on their breach of implied warranty claim.

Although the Court's analysis could end here, there is an additional point the Court must address.[13] Irrespective of whether there was an "occurrence" in this case, the Sniders go to great lengths to establish that their judgment should fall under coverage purportedly provided through the Policy's "Products-Completed Operations." The Sniders point to the declarations page and coverage schedule of the Policy to support this proposition. After review, the Court agrees with the Sniders that the Policy's coverage schedule states a

---

[13] Because the Court has found that there was no "occurrence" here sufficient to trigger coverage under the Policy, it is unnecessary for the Court to discuss the parties' arguments as to exclusions from coverage, exceptions to those exclusions, and whether the verdict was specific enough for the Sniders' to prove whether any of the damages awarded were for covered claims. Moreover, because the Court did not rely on any of the "evidence" or arguments Penn National moved to strike in reaching its decision that there is no "occurrence" in this case, and thus, no coverage, Penn National's motion to strike (Doc. #90) is DENIED as MOOT.

$2,000,000 aggregate limit of insurance for "Products–Completed Operations," which is just what it is—an applicable *limit* of insurance.  What the Sniders have failed to do is persuade the Court that the Policy provides coverage for anything other than bodily injury and property damage (Coverage A), personal and advertising injury liability (Coverage B), and medical payments (Coverage C).  (Doc. #87-1.)

An opinion from the Southern District of Florida recently addressed the very argument that the Sniders are making with respect to "additional" coverage provided under the "Products Completed Operations Hazard" of a CGL policy similar to the one at issue here, finding that "the products-completed operations hazard provision does not create distinct coverage separate and apart from the delineated coverage portions of the policy."  *Sparta Ins. Co. v. Colareta*, 2014 WL 31986, at *6 (S.D. Fla. Jan. 6, 2014).  The district court explained:

> The CGL lists only three coverages, which are each set forth in Section I of the policy: Coverage A (Bodily Injury and Property Damage Liability), Coverage B (Personal and Advertising Injury Liability[)], and Coverage C (Medical Payments).  Each of these coverages contain its own insuring agreement and exclusions.  By contrast, "products-completed operations hazard" is listed only in the "Definitions" section of the policy and is not designated as a type of coverage.  As a result, any claim falling under the definition of "products-completed operations hazard" is subject to the terms and limitations of the coverage portion to which it applies.  Because "products-completed operations hazard" is defined as applying to bodily injury and property damage, it necessarily falls under Coverage A of the CGL.
>
> Moreover, Section II, which lists the policy's limits of insurance, states as follows: "The Products-Completed Operations Aggregate Limit is the most we will pay *under Coverage A* for damages because of 'bodily injury' and 'property damage' *included in the 'products-completed operations hazard*.'"  The fact that the policy sets a limit on Sparta's liability under Coverage A with respect to products-completed operations hazards makes clear that the products-completed operations hazard clause falls under the terms of Coverage

A and is not a free-standing form of coverage.  As a result, any determination on Sparta's liability under the CGL in the underlying litigation must necessarily be predicated upon an interpretation of the coverage afforded under Coverage A as a whole, not merely the products-completed operations hazard portion.

*Id.* at \*6.

The same can be said here.  "Products-completed operations hazard" is listed in the Definitions section of the Policy only and is not designated as a separate type of coverage.  (Doc. #87-1.)  Moreover, the Limits of Insurance section in the Policy states that the products-completed operations aggregate limit is the most Penn National will pay ***under Coverage A*** for damages because of "bodily injury" and "property damage" included in the "products-completed operations hazard."  (Doc. #87-1.)  Thus, Penn National's indemnity liability is predicated on the coverage afforded under Coverage A and not a separate form of coverage provided through the "products-completed operations hazard."  In short, the Sniders' argument regarding the "products-completed operations hazard" section of the Policy does not change the end result in this case—that being that Penn National is not obligated to indemnify the Beale Defendants for the $700,000 judgment entered in the Sniders' favor in the underlying litigation.

## V.  CONCLUSION

Based on the foregoing, it is hereby ORDERED as follows:

1.     Pennsylvania National Mutual Casualty Insurance Company's Motion for Summary Judgment (Doc. #85) is GRANTED in PART and DENIED in PART.  The motion is DENIED as MOOT to the extent it seeks summary judgment on the duty to defend

counterclaims made by the Beale Defendants, and GRANTED in all other respects.

2.      Pam and Howard Sniders' Motion for Summary Judgment (Doc. #86 ) is DENIED.

3.      The trial currently set March 10, 2014 is CANCELLED.

A separate final judgment consistent with this Memorandum Opinion and Order will be entered.

DONE this the 11th day of February, 2014.

_____/s/ Mark E. Fuller_____
UNITED STATES DISTRICT JUDGE